Van Horn v. Clark.

WILLIAM S. VAN HORN

v.

WILLIAM H. CLARK, MICHAEL C. CLARK and
DAVID RYMAN.

[Filed April 29th, 1898.]

1. B. purchased land from W. and erected thereon a dwelling, and after-wards, under parol agreement with W., entered upon remaining lands of W. and laid therein iron pipes from a spring of water thereon to his own land and a hotel property of W. The parol agreement was to the effect that the aque-duct thus made should be the joint property of B. and W. and their heirs and assigns, and that the spring of water should be and remain for the use and under the control of B. and W. and their heirs and assigns forever.—*Held*, that B., having expended his time and money in the construction of the aque-duct for the benefit of W. and himself upon faith in the parol agreement, took a license to use the spring and lands of W. in accordance with the agreement, which equity will not permit W. or his heirs or assigns to revoke, and in the enjoyment of which equity will protect B.

2. The obvious design of the sealed agreement recited at length below is, in consideration of mutual obligations, to thereafter, by that instrument, sub-ject the land and spring to Moore's use permanently. It created an easement.

3. A court of equity will regulate the enjoyment of mutual rights in a com-mon easement.

---

On demurrers to bill.

*Mr. George M. Shipman* and *Mr. Flavel McGee*, for the com-plainant.

*Mr. Henry S. Harris*, for the defendants Clark.

*Mr. William H. Morrow*, for the defendant Ryman.

THE CHANCELLOR.

The object of the bill is to define the relative rights of the complainant and defendants in a designated spring and the water

therefrom, and to secure to the complainant the enjoyment of his right. The case presented by the bill is this : The complainant, Van Horn, in January, 1871, became the owner in fee, by deed from John Moore, of a dwelling-house property on the north-west side of the public road in the village of Marksboro, in Warren county, adjoining a tavern or hotel property, which now belongs to the defendant William H. Clark, and is controlled and managed by his father, Michael C. Clark. Prior to the ownership by Moore, the complainant's property belonged to one James Blair, who had purchased it from Abram and Isaac Wild-rick. In January, 1866, while Blair was the owner of the property, the Wildricks were the owners of the tavern property and also of other land, upon which, about a mile away, there existed, and yet exists, a spring of running water. At that date Blair entered into a verbal agreement with the Wildricks, under which he was permitted to go upon the lands of the Wildricks, " and," in the language of the bill,

"lay under the ground of the lands of the said Abram and Isaac Wildrick an aqueduct of iron pipes, from a spring of water on the lands of the said Abram and Isaac Wildrick and over and across and through their lands, for the purpose of bringing water to the said village of Marksboro, immediately in front of and into and upon the lands of the said James Blair and into his dwelling-house and other buildings upon the lot of land above described, for the use and convenience of the said property, and into and upon certain lands of the said Abram and Isaac Wildrick in the said village of Marksboro, upon which there was an hotel and other buildings, for the use and convenience of said hotel property, and that the said aqueduct should be the joint property of the said James Blair and Abram and Isaac Wildrick and their several heirs and assigns, and that the said spring of water should be and remain for the use of and under the control of both parties and their heirs and assigns forever, and that each party and their heirs and assigns should have the privilege of en tering upon the lands of the other along the line of said aqueduct of iron pipe for the purpose of repairing the same, and that they should be joint owners thereof and also of said spring, and should have the privilege of entering upon the lands of each other for the purpose of repairing said aqueduct, when repairs should be necessary, doing no unnecessary damage to the lands."

Blair conveyed to Moore, with privilege and right of use of the water of the spring. In October, 1866, Moore entered into

a written agreement, under seal, acknowledged and recorded, with the Wildricks, in which "it was expressed," again using the language of the bill, .

"that whereas, some years before the date thereof, the party of the first part, Abram and Isaac Wildrick, by verbal agreement with James Blair, who resided and owned a lot of land in the village of Marksboro, on which there was a dwelling-house, storehouse, barn, wagon-house and other outbuildings, situate in the northwest side of the public road leading from the Marksboro hotel to the village of Paulina, which lot of land was purchased by the said James Blair of the said party of the first part—they, the parties of the first part, also owned lands in the village of Marksboro, on which there was a large tavern-house and shed and other outbuildings, and are adjoining the Blair lot—and that by said agreement the said Wildricks and James Blair proceeded to lay an aqueduct of iron pipes, from a spring of water on lands of the parties of the first part through lands of said parties of the first part, for the purpose of bringing the water from the spring to the village of Marksboro, immediately in front of and into the buildings belonging to the parties, the parties of the first part being at half the expense and the said James Blair the half, the said aqueduct to remain the joint property of the said parties and their several heirs and assigns; each party, their heirs or assigns to have the privilege of entering on said lands for the purpose of repairing said aqueduct, when repairs are necessary, doing no unnecessary damage to the lands; each party or their assigns to be at half the expense of all necessary repairs to the spring and main pipes; also, each party, their heirs and assigns shall have the right and privilege to insert a pipe or pipes into the main pipe, of not more than three-fourths of an inch bore, for the purpose of supplying their own lands and buildings with water.

"And whereas the said John Moore, party of the second part, was then the owner of the Blair lot referred to in the said agreement, the said James Blair having conveyed the same to the said John Moore by deed bearing date the 22d day of March, 1866, also all the said Blair's rights, title and interest in the said aqueduct and water works, it was agreed by and between the parties to the said agreement that the said spring, aqueduct and water works should remain under the control of the said parties, with the same rights and privileges as the said James Blair had at the time he conveyed the said property to the said John Moore."

When Moore sold to Van Horn, in 1871, he, by writing under seal, assigned to Van Horn all his right, title and interest under the agreement just mentioned. Prior to 1889 the main pipe from the spring was two inches in diameter, and was tapped by a pipe three-quarters of an inch in diameter through which

water continually ran into a large receptacle in front of the
hotel, and also by a pipe of similar size which carried water to
the property of the complainant. In 1889 new pipes were laid
by the complainant, the then owner of the spring and hotel
property, George B. Swain, and one Nelson Budd, at their joint
expense, and the tap to the tavern property was then increased
to a pipe one inch in diameter. Before such renewal of pipes
the complainant and the owner of the spring and tavern proper-
ties joined in selling a right to Nelson Budd to tap the main
pipe and take water for his house. After the renewal of the
pipes the complainant increased his use of the water by carrying
it into his house to bath-tubs and a steam-heating apparatus,
and also by taking it to his barn and sprinkling his lawn. In
April, 1894, William H. Clark became the owner of the spring
and hotel properties by deed, which provided that the convey-
ance was " subject to the rights to the use of the spring and the
pipe leading therefrom, now owned by William Van Horn."
Knowing the relation of Van Horn to the aqueduct and the
spring, Clark rebuilt the old tavern into a three-story hotel and
put water in it, also built a large barn capable of accommodating
fifty horses, and, without Van Horn's consent, replaced the
water tap from the main aqueduct-pipe to his house with a pipe
one and one-half inches in diameter, and tapped the main aque-
duct with another pipe to his barn half an inch in diameter, and
about the same time gave the defendant David Ryman, for a
pecuniary consideration paid to him alone, permission to tap the
main aqueduct for a supply of water to Ryman's house. The
defendant William H. Clark threatens to tap again for a water-
supply to still another house. The complainant's water-supply
has been greatly diminished in consequence of the large draughts
upon the aqueduct and spring.

The defendants contend that the written agreement of 1866
was not intended to confer upon Moore other right than Blair
had when he conveyed to Moore, and that such right was a
mere revokable license. If the first part of this proposition be
true, which I do not agree as will presently be again stated, was
the right of Blair a mere revokable license?

Blair acted under a verbal agreement with the Wildricks, which did not contemplate any further grants or assurance of title, and could not at law operate as a grant of the easement. Such a grant could be expressly had by instrument under seal only. *Lawrence* v. *Springer, 4 Dick. Ch. Rep. 289.* The parol agreement did not confer an estate in lands. It was a license, so far as the use of the spring and lands of the Wildricks was concerned. Chief-Justice Vaughan said, in *Thomas* v. *Sorrell, Vaugh. 351:* "A license properly passeth no interest, nor alters or transfers property in anything, but only makes an action lawful which without it had been unlawful." But, upon the faith of the license, Blair entered upon the land of the Wildricks and there gave his attention and expended his money in the construction of the aqueduct for the benefit of the Wildricks and himself. The license was, in terms, perpetual and explicit. It contemplated its continuance so long as the water of the spring should be needed by the properties of the parties to it. It tendered a continued supply of water and thereby induced the expenditure of Blair's money and time. After the aqueduct was built, I think that the revocation of the license prior to the termination of its use to the lands of the licensee would work a fraud upon the licensee, and therefore that equity will, by injunction, prevent a revocation and restrain interference with the enjoyment of the license. *Pom. Spec. Perf.* § *132; Raritan Water Power Co.* v. *Veghte, 4 C. E. Gr. 152; S. C. on appeal, 6 C. E. Gr. 463; Morton Brewing Co.* v. *Morton, 2 Dick. Ch. Rep. 158; Jones Easem.* § *861; Cronkhite* v. *Cronkhite, 94 N. Y. 323.*

I do not find that the views expressed by Chief-Justice Beasley, in *Lawrence* v. *Springer, supra,* militate against the correctness of this conclusion. There the proposition disapproved was that a parol license without any consideration moving to the licensor, operating as part of an easement, is irrevocable in equity where the licensee has gone to expenditures in the erection of structures on his own land in pursuance of such authority. The chief-justice deprecated that which he

deems to be a relaxation of the statutes of frauds beyond the "ancient decisions in the English chancery." Within relaxation admissible, however, he places a parol agreement for the purchase of lands or some interest in them, which has been performed to the extent of possession having been taken in part execution of it, and he illustrates, as being within the principle of that relaxation, this formula: "When A permits B to build a house upon his land, the situation almost necessarily implies the existence of some contract, which is thus partly performed between them. To some extent, therefore, such a matter does not rest absolutely in parol, and the area of possible fraud or perjury is therefore circumscribed and hindered. But when B, from his own land, turns his water into the drains on the land of A, the situation does not imply a contract."

He expressly approves of *Raritan Water Power Co.* v. *Veghte* as having been rightly decided, and he passes without disapproval the case of *Duke of Devonshire* v. *Elgin, 14 Beav. 530, 20 L. J. (N. S.) 495*, where the answer admitted that there was a parol agreement to allow a water-course to be made through the defendant's land in consideration of the payment of a reasonable sum, and as the only disagreement was as to the terms of the contract with respect to the consideration, the master of the rolls decreed that the complainants were entitled to the free use and enjoyment of the water-course in Elgin's lands, and, by injunction, restrained interference with it, making reference to a master to ascertain the compensation to be paid Elgin.

The case considered is stronger than the Elgin case, for, upon demurrer, the fact of the parol agreement and its terms, and that the stipulated consideration was given, are all admitted as stated in the bill.

I think that, in equity, Blair had not only the right of property in the aqueduct which he had joined in constructing, but also had permission or license to take from the spring a supply of water for his dwelling through the aqueduct, which permission or license equity would not permit to be revoked, and

31

which, in consequence of that protection in equity, gave an interest quite as beneficial as an easement.

But, as I have said, I do not agree that the written and sealed agreement of October, 1866, between Moore and the Wildricks, was not intended to confer upon Moore other claim or right than Blair actually had when he conveyed to Moore. The agreement was evidently intended to both permanently regulate the maintenance and use of the aqueduct and spring and to confirm, by solemn covenant under seal, the right contemplated as Blair's in the recitals of the covenant. The agreement first recited, the situation, use and ownership of the properties of Blair and the Wildricks—the fact that Blair had purchased his property from the Wildricks, the fact that Blair and the Wildricks had constructed the aqueduct at their joint expense, under verbal agreement (1) that the "*aqueduct*" should remain in the joint property of them and their heirs and assigns; (2) that each and their heirs and assigns might enter upon the lands upon which it was constructed to make necessary repairs to it; (3) that each and their assigns should bear half the expense of repairs to the "spring and main pipes," and (4) that each and their heirs and assigns should have the right and privilege to insert a pipe or pipes into the main pipe of not more than three-fourths inch bore, for the purpose of supplying their own lands and buildings with water—then, that Moore had become the owner of the Blair lot and of Blair's right, title and interest in the aqueduct and water works, and terminated with an agreement that the spring, aqueduct and water works should remain under the control of Moore and the Wildricks, with the same rights and privileges as Blair had when he conveyed to Moore.

The obvious design was, in consideration of mutual obligations, to thereafter by that instrument subject the spring and lands to Moore's use as the parol agreement recited designed that they should be subjected to the use of Blair, and as the design of the parol agreement was to make that use permanent, the sealed covenant or deed did the same. Such a covenant appears to be all that is necessary to create an easement in the land. *2 Washb. Real Prop. 317.*

It would seem, then, that both at equity and in law Moore had a right to be recognized and protected which was appurtenant to his land at least as long as the necessity for its use remained, which passed to the complainant, Van Horn, if not by the deed of conveyance of his land, by the express assignment thereof which was given at the time of the delivery of the deed.

The complaint is that William H. Clark has tapped the aqueduct with two pipes, one of which is double the three-quarters of an inch in diameter which the covenant allows; that he threatens to tap it with an additional pipe; that he has permitted the defendant Ryman to tap the aqueduct and to give away water, and that Ryman, availing himself of that permission, has tapped the aqueduct and is giving away water. All of which use, causing constant diminution and sometimes stoppage of the water-supply to the complainant, does him irreparable injury.

It appears to me to be plain that the only adequate remedy is the regulation of the use of the aqueduct and spring between the complainant and the defendants. Regulation of the enjoyment of mutual rights in a common easement is within the cognizance of a court of equity. *Delaware, Lackawanna and Western Railroad Co.* v. *Erie Railroad Co.,* 6 C. E. Gr. 298; *Lehigh Valley Railroad Co.* v. *Society, &c.,* 3 Stew. Eq. 145, 161; *National Docks Railway Co.* v. *Central Railroad Company of New Jersey,* 5 Stew. Eq. 767; *National Docks, &c., Railway Co.* v. *United Companies,* 24 Vr. 217; *Same* v. *Pennsylvania Railroad Co.,* 9 Dick. Ch. Rep. 13. In the first of these cases the late Chief-Justice Beasley, sitting for the chancellor as master, said : " They are tenants in common of an easement, and if this court cannot protect the one against the injustice of the other, the party whose rights are invaded is clearly without any adequate remedy, for it is certain that either of these companies, thus situated, can so act with respect to the common easement as to render it worthless to the other, and thus bring upon the latter incalculable mischief. The general cognizance of equity in cases of this kind, where property is enjoyed in common, will not, it is presumed, be disputed by anyone, and I can perceive no reason why this power should not exist where

two railroads are such tenants in common as well as in other cases."

Neither the admitted allegations of the bill nor the provisions of the covenant and agreement on this subject are involved in obscurity. I perceive no reason why the agreement may not be at once enforced by this court.

The defendant Ryman is taking water in virtue of the right of Clark so far as that right may extend. It does not appear that he takes more water than Clark was entitled to take from the aqueduct, and hence it is not shown that he evicts the complainant from his right so that the complainant may maintain an action at law against him.

I think that, because of his right had from Clark, he is a proper party to this suit. In regulating the use of the water, his claim of right, whatever it may be, may be taken into consideration, and dealt with in the regulation of enjoyment of the common right.

I will overrule the demurrers, with costs.